Filed 4/27/22  P. v. Meraz CA4/1
Opinion following rehearing

**OPINION ON REHEARING**

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078422 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD233469) |
| RAFAEL MERAZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Joan P. Weber, Judge.  Reversed; remanded with directions.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, and Steve Oetting and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

In 2012, a jury convicted Rafael Meraz of first degree murder (Pen. Code,[1] § 187, subd. (a)). The jury found that Meraz was a principal and a principal in the murder, personally used a firearm, and proximately caused great bodily injury, within the meaning of section 12022.53, subdivisions (d) and (e)(1). Meraz was sentenced to an indeterminate term of 50 years-to-life in prison.

Meraz appealed, and this court affirmed his conviction in an unpublished opinion, *People v. Aguon et al.* (Nov. 29, 2016) D064367.

In 2020, Meraz filed a petition for resentencing under section 1170.95. The trial court appointed counsel, received briefing, and reviewed the record of conviction, including the court file and the prior opinion of this court. The court held a hearing and denied the petition by written order. The court found Meraz had not made a prima facie case for relief and determined he was not eligible for resentencing under section 1170.95. The court denied the petition without issuing an order to show cause (OSC).

Meraz appealed, contending the court erred in denying his petition without first issuing an OSC and holding an evidentiary hearing. We affirmed the order in an unpublished opinion.

Meraz filed a petition for rehearing noting, among other things, that on October 5, 2021, the Governor signed Senate Bill No. 775 (Senate Bill 775) into law. (Stats. 2021, ch. 551.) Effective January 1, 2022, Senate Bill 775 amended section 1170.95 to further clarify the resentencing petition process. We therefore granted Meraz's petition for rehearing and requested the parties submit simultaneous supplemental briefs addressing the impact of Senate Bill 775 on the instant matter.

---

[1]     All further statutory references are to the Penal Code.

After considering the parties' respective supplemental briefs and reconsidering the matter, we reverse the superior court's order summarily denying Meraz's petition and remand the matter with instructions for the court to issue an OSC and hold the appropriate evidentiary hearing. We offer no opinion as to the proper result of that hearing.

STATEMENT OF FACTS

The facts of the offense are set forth in our prior opinion. We will incorporate them here for convenience.[2] (*People v. Aguon et al.*, *supra*, D064367.)

Prosecution

On October 21, 2007, V.B. and J.P. were hanging out in front of Freese Elementary School in Lomita Village, talking to some girls. Meraz rode up on a bicycle, throwing gang hand signs as he approached. He asked the group if it was from "Pussy Hills," a derogatory term for Lomita Village gang rivals Paradise Hills. He said he was "Grims" from "Lomita." He talked to them as if they were gang members, but when they told him they did not "bang," and were not disrespecting him, he said, "Cool," and left. He appeared to be either drunk or high.

R.C. joined the group, and V.B. told him what had just happened. At that time, Meraz rode his bike back to the group and said something about blasting them. He repeated his comments about "Pussy Hills." He gave R.C. an overly firm handshake or overly aggressive fist bump. He asked if they wanted to get "blasted." He pulled away his jacket to reveal a gun in his waistband. Then he rode away.

---

[2]     We do so in nearly verbatim fashion except to sometimes use first names and/or initials in naming third parties involved in the subject offenses to protect privacy as much as possible.

3

V.B. and R.C. decided to go hang out instead at the Balderas house, which was just down the street. About an hour and a half later, they, along with other Balderas family members including Vidal, were hanging out in front of the house listening to an oldies music show on the radio. Meraz rode up on his bicycle flashing gang hand signs in time to the music. Vidal confronted him, asking him why he was disrespecting the household. Meraz explained that this was Lomita Village, and he was Grims. Vidal said they did not bang at that house. Meraz kept saying this was "their" neighborhood. Vidal told him to leave. Meraz lifted up his shirt, revealing his gun, and started to advance on Vidal.

R.C. sprang forward and punched Meraz in the face, knocking him to the concrete. Meraz pulled his gun out as R.C. held him down. R.C. kept hitting him. Vidal eventually pried the gun from Meraz's hands. He told Meraz, "You're going to stay right here, homie and wait for the police." He lectured Meraz about disrespecting his family. He told Meraz that if the older homies in Lomita Village had taught him to disrespect nongang houses, then they had taught him wrong. He said he was going to talk to the older homies and that they would set Meraz straight.

Vidal's sister, W.B., called 911. In the call, Vidal and Meraz can be heard in the background. Vidal chastised Meraz for coming around and "disrespecting" with a gun, and saying, "I don't care homes, we don't care about the neighborhood, homes. I don't care about your neighborhood." Meraz responded, "I'm gonna fuck it up homie."

Meraz got cut when he hit the concrete. The police took him to the hospital, where he denied drug or alcohol use but tested at a 0.13 percent

4

blood alcohol level. He had scalp lacerations that required staples to close, and a fractured thumb. The police recovered the gun, which was loaded with 11 rounds.

Ten days later, Vidal was killed in front of the Balderas house after returning from trick-or-treating with his four-year-old daughter. There were three assailants. Vidal struggled with one at the entrance to the yard and was shot. The men started running away, and Vidal took a few steps after them, but then fell face down on the ground. Vidal suffered six gunshot wounds, two through the heart. Just before the shooting, one of the assailants said, "What's up now."

The shooter was wearing a black hoody, with a bandana covering his face. One of the others had a mask similar to what the villain wore in the movie *Scream*. One had a skull mask. There were no shell casings at the scene, which suggested that the weapon fired was a revolver. All the bullets recovered at the scene were fired from the same gun.

Some children trick-or-treating in the neighborhood heard gunshots and a woman scream and saw the men run away. The men were masked, one with a Scream mask, another with a skull mask, and one with a bandana. One of the men was holding a rifle. As the men went by them, they asked what had happened. The man holding the rifle turned and stared at them, but one of his companions said, in Spanish, "Hey, dude. Calm down. Don't do anything. We finished."

Shortly after the shooting, a gang suppression detective arrested M.M. for a curfew violation near Meraz's house. M.M. had bullets and a loaded speed loader for a revolver in a nylon bag in his pocket. He said he was coming from a friend's house and had found the items on the ground. His cell

phone reflected a call at 10:15 p.m. that night to "Grims" at Meraz's home number. The cartridges in the speed loader in M.M.'s pocket were .38 specials, consistent with the spent bullets recovered from the scene.

Police searched Meraz's house a few hours after the shooting and found a skull mask under some jeans. The mask had Meraz's DNA on it. They found a black bandana halfway under a bed. They found a pair of pants in a bedroom with a paper bearing the name "Mikey" as well as Meraz's telephone number in the pocket.

Subsequent testing detected several gunshot residue particles (one "characteristic" and several "consistent") in the fabric of the pants. A black hooded windbreaker had several "consistent" gunshot residue particles.

Meraz claimed he had not left the house that day since coming home from school. He maintained this story even when confronted with the fact his brother and mother had told police he had been out of the house that evening. His brother told police that Meraz came home about 8:00 p.m. or 8:30 p.m. that night, changed out of his clothes right away, and took a shower.

Meraz admitted, however, that M.M. had been at his house that night.

E.H. was K.B.'s ex-wife. Both she and K.B. were Lomita Village gang members. Three days after the shooting, K.B. asked E.H. to drive him to Aguon's house. She did, and once there, encountered Aguon and his cousin B.T., also a Lomitas Village gang member. Aguon and B.T. lived in the same house.

K.B. asked, "What happened?" and B.T. slapped Aguon on the back of the head, saying, "This fool did the wrong job—This fool didn't even do the job right. He got the wrong brother." E.H. asked if B.T. meant Vidal, and he said "Yes." Aguon then told how about a week earlier, another homeboy had gone to confront Balderas about being from Paradise Hills, but Victor's older

6

brother, Vidal, had beaten him and taken his gun. Aguon then said that he and two other guys had gone to the Balderas house on Halloween. They had a Scream mask. They got into a fight with Vidal when he blocked them from getting into the house. There had been two gunshots, and Vidal had kept fighting. After two more gunshots, Vidal dropped. Aguon and the others took off running.

While telling this story to E.H. and K.B., Aguon was, in E.H.'s words, "cocky" and "giggling." She found his attitude offensive because she was friends with Vidal's brother.

E.H. had been a paid police informant for some time and had used her payments to support her drug habit. She had stopped using drugs and committing crimes in 2007, a few months before the shooting, and had gotten a job with an organization called "Second Chance." She was not paid for the information she gave about Vidal's murder, and the police promised her she would never have to testify. Nevertheless, several years after providing the information, with her life finally straightened out, she was told she was going to have to testify at trial. She had to leave her job at Second Chance and be relocated in the witness protection program.

E.H. had thought Aguon's surname was Tejeda, since he lived with B.T. Police checked their records for a "Mikey Tejeda," but came up with nothing. The police appear to have let the matter drop until reopening the case in 2010 when Aguon was arrested.

While in jail in 2011, Aguon learned it was E.H. who had told the police about his involvement in Vidal's murder, and he called home to instruct his cousin B.T. to deny to investigators that any such conversation had ever happened. B.T. was not home, so he told B.T.'s brother, "I was just gonna tell your brother . . . I talked to my attorney . . . today, and, and he's giving—gave

7

me the lay-down, . . . what's going on . . . . I was gonna have that fool go and talk to you guys or something, and then see (unin)— you know what I mean?" "But I don't think he's gonna go. I think he's probably send somebody else. Like an investigator . . . ." He continued, "my attorney says some of the stuff that, uh, that whoever's saying that shit . . . . That some of that stuff . . . supposedly it happened in front of the house, and [Vidal] was there. You know what I mean? And, and that should never even happened . . . That's wh—that's why I was like—I was gonna tell [Vidal], like, 'Man, that's some bullshit,' you know?" "Yeah, . . . they're saying that—saying that was said in front of the house and he—[Vidal] was there . . . ." "If anything, uh, like, uh, if anything I could just be like, 'Man, you could even ask my cousin, you know?'" He continued, "Yeah, make sure that fool knows . . . That fucking shit's some bullshit. . . . Never even happened. . . . You know what I mean? That mean I'm in here for nothin' and shit. Alright."

San Diego Police Department Detective Damon Sherman testified as the People's expert on the Lomita Village gang. According to Sherman, Lomita Village has all the characteristics required by the Penal Code for a criminal street gang. In Sherman's opinion, Meraz, known as Grims, was a Lomita Village gang member at the time of the shooting. Sherman also opined Aguon, known as "Villen," was a Lomita Village gang member in 2007.

In hypotheticals mirroring the facts of the case, Sherman opined as follows: If a gang member had his gun taken and was beaten so badly he had to go to the hospital, and the gun was given to law enforcement, that was an act of disrespect which, in gang culture, required a retaliatory act using greater force and power to inflict a much greater injury. Sherman further opined the shooting, if committed by multiple Lomita Village gang members, was committed in association with Lomita Village and benefited that gang.

8

It repositioned the gang and the disrespected gang member in the gang community and reinstilled fear in the civilian community. If the phrase, "what's up now" was said at the time of the shooting, this demonstrated the disrespected person's affirmation that he had won in the long run. In Sherman's opinion, if there were statements after the shooting, such as "we're finished now," they showed the job was completed as planned.

### Defense

Aguon's defense at trial was denial. He presented alibi witnesses. He also attempted to impeach E.H., by offering evidence E.H. was familiar with the justice system. She had multiple felony convictions. Following a conviction in 2005, she began working as a confidential informant for both the Chula Vista and National City Police Departments. As a result of her efforts, she was given a probationary sentence. She violated the terms of probation with a series of check forgeries and began working with a deputy district attorney. She agreed to do a training video in exchange for summary probation and continued to work as an informant. During this time, E.H. was a drug addict and spent her informant compensation on drugs. She did not pay any of the considerable restitution owed in any of her cases. In 2007, E.H. got sober and started working at a nonprofit organization. She worked there until her relocation. Since her relocation, E.H. has maintained employment, but the income does not cover her monthly expenses. The district attorney's office originally paid approximately $44,000 in relocation fees and, at the time of trial, paid her rent, food and utilities and gave her an additional monthly stipend of $975.

Meraz's defense at trial was that the prosecution failed to prove its case.

9

A. Legal Principles

Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437) was enacted to " 'amend[ ] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 842.)

The Legislature stated its intent in Senate Bill 1437 to exclude an "actual killer" from relief under section 1170.95 as follows:

> "It is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."

(Stats. 2018, ch. 1015, § 1, subd. (f).)

Senate Bill 1437 also created section 1170.95 as a process for persons previously convicted of murder to seek resentencing in light of the changes enacted by Senate Bill 1437. Section 1170.95, subdivision (c) provides: "Within 60 days after service of a petition that meets the requirements set forth in subdivision (b), the prosecutor shall file and serve a response. The petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be extended for good cause. After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is

10

entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."

In *People v. Lewis* (2021) 11 Cal.5th 952, 961-962 (*Lewis*), the California Supreme Court held trial courts can deny petitions under section 1170.95, after appointment of counsel and briefing, if readily accessible facts from the record of conviction establish the petitioner is not legally eligible for resentencing. The court explained that trial courts can and should consider the record of conviction at the prima facie stage of review of section 1170.95 petitions. (*Lewis*, at pp. 970-971.) However, courts are not permitted to engage in factfinding or making evidentiary findings at the prima facie review stage. (*Id*. at pp. 971-972.)

Jury instructions and verdict forms in the court file from the trial proceedings may be considered to determine whether a petitioner has made prima facie showing of improper imputation of malice in the trial.

In addition, the court in *Lewis* recognized prior appellate opinions from the original conviction are legitimate sources of readily accessible facts regarding the theory upon which the petitioner was originally convicted. (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

On October 5, 2021, the Governor signed Senate Bill 775 (2021-2022 Reg. Sess.). Effective January 1, 2022, relevant here, Senate Bill 775 expanded the scope of section 1170.95 from petitioners "convicted of felony murder or murder under the natural and probable consequences doctrine" to petitioners convicted under any "other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1170.95, subd. (a) as amended by Stats. 2021, ch. 551, § 2.) Regarding the evidentiary hearing, Senate Bill 775 also clarified that the rules of evidence govern the

admission of evidence, and the court can consider the procedural history of the case recited by any prior appellate opinion.  (§ 1170.95, subd. (d)(3).)  Moreover, "[a] finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing."  (*Ibid.*)

## B.  Analysis

In their supplemental brief, the People argue Senate Bill 775 "has no effect on the instant appeal because the record of conviction conclusively establishes that [Meraz] was convicted of first degree premeditated murder as either a direct perpetrator or a direct aider and abettor."  In addition, the People emphasize that in summarily denying Meraz's petition, the superior court did not engage in any factfinding or weigh any evidence.  To this end, they note the superior court "reasoned that 'the charging document, jury verdict, and 4th DCA opinion all indicate [Meraz] was convicted exclusively on a theory of premeditation and deliberation.' "  Therefore, the People set forth that the record of conviction relied on by the superior court to deny Meraz's petition primarily consists of the charging document, jury verdict, and our prior opinion in the underlying appeal.

As a threshold matter, we find no support for the People's contention that the record of conviction establishes that Meraz was convicted as the direct perpetrator.  The charging document does not and cannot establish that fact.  The jury did return a verdict against Meraz for murder in the first degree, but the verdict simply says that the jury found Meraz guilty of the crime first degree murder in violation of section 187, subdivision (a).  There is nothing in the verdict that states Meraz was the actual killer.  Indeed, the jury made a true finding that Meraz was a principal and a principal in the

12

murder personally used a firearm and proximately caused great bodily injury, within the meaning of section 12022.52, subdivisions (d) and (e)(1). It did not find that Meraz fired a gun, killing the victim. Finally, our prior opinion does not establish that Meraz is the actual killer. In fact, none of the legal issues raised in that appeal specifically addressed Meraz's role in the killing.[3]

Additionally, we fail to see how the record of conviction considered by the superior court supported the court's order summarily denying Meraz's petition. Similar to failing to establish that Meraz was not the actual killer, the charging document and jury verdict do not establish that Meraz is ineligible for resentencing under section 1170.95. Neither establish on what theory and what evidence the prosecution proved its case against Meraz. Moreover, the charging document and the jury verdict do not tell us what the jury relied on in finding Meraz guilty of first degree murder. In other words, neither document establishes that Meraz would still be convicted for murder after the changes to the felony murder rule and the natural and probable consequences doctrine following Senate Bills 1437 and 775.

Further, we are troubled by the superior court's reference to our prior opinion as establishing that Meraz is ineligible for resentencing under section 1170.95. Although our high court indicated that an appellate opinion is "generally considered to be part of the record of conviction," it also cautioned that "the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' " (*Lewis, supra*, 11 Cal.5th at p. 972, quoting *People v. Woodell*

---

3     We granted Meraz's request for judicial notice of the record on appeal in *People v. Aguon et al.*, *supra*, D064367. Meraz points out that at Meraz's trial, the prosecutor asked the jury to find that Aguon was the actual killer.

13

(1998) 17 Cal.4th 448, 457.) And our prior opinion is limited in its application to the issues raised by Meraz's petition under section 1170.95.

For example, Meraz challenged the verdict form returned by the jury, under section 1157, because the information charging him with murder was silent as to the degree, and the jury was not asked to return, and did not return, any specific finding on the truth of the allegation of premeditation and deliberation. (See *People v. Aguon, supra*, D064367.) In concluding Meraz's argument lacked merit, we noted that "[t]he prosecution proceeded on a theory the homicide constituted murder in the first degree based on premeditation and deliberation. The jury was so instructed. The trial court also instructed the jury on second degree murder." (*Ibid.*) However, we did not discuss the actual jury instructions or review the evidence relied upon by the jury to convict Meraz. We merely determined that the verdicts used at Meraz's trial did not violate section 1157.

The other issues raised in the underling appeal dealt with alleged prosecutorial misconduct, the admission of gang evidence, and whether Meraz's sentence violated the Eighth Amendment. (See *People v. Aguon, supra*, D064367.) None of those issues directly impact Meraz's petition for relief under section 1170.95. And while our opinion includes a recitation of pertinent facts, we provided those facts as context to discuss the issues raised in the appeal. Our factual discussion did not establish any fact as a matter of law and certainly did not definitively prohibit Meraz's claim that he is eligible for resentencing under section 1170.95.

Moreover, Senate Bill 775 further emphasizes the limited role an appellate opinion may play during an evidentiary hearing where the rules of evidence apply: "The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1170.95, subd. (d)(3).) If the

14

appellate opinion plays such a limited role at an evidentiary hearing, it logically follows that a court cannot rely on it as a factual basis at the prima facie stage of a resentencing petition, especially when the opinion did not consider the relevant issue or make a finding as a matter of law that renders a petitioner ineligible for resentencing. As such, we see nothing in our prior opinion on which the superior court could base its decision that Meraz is ineligible for relief under section 1170.95 at the prima facie stage.

Further, because we granted Meraz's request for judicial notice of the appellate record in *People v. Aguon, supra*, D064367, both parties cite to portions of that record to support their respective positions. Nevertheless, that record was not in front of the superior court when it summarily denied Meraz's petition. As such, we will eschew a thorough discussion of that record and simply observe that there appear to be arguments that each side can make regarding what evidence was offered at trial and how that evidence impacts Meraz's petition. These arguments further buttress our conclusion that the superior court's order summarily denying Meraz's petition must be reversed.

Here, on the record before us, we have some concern that Meraz's murder conviction is based on a theory under which malice was imputed to him solely based on his participation in a crime. It might be that the evidence will show that Meraz personally acted with requisite mental state rendering him ineligible for relief under section 1170.95. (Cf. *People v. Langi* (2022) 73 Cal.App.5th 972, 984.) That said, neither this court nor the superior court can make such a determination absent an evidentiary hearing under section 1170.95. We therefore reverse the order summarily denying Meraz's petition and remand the matter with instructions that the superior court issue an OSC and hold an evidentiary hearing.

## DISPOSITION

The order denying Meraz's petition for resentencing under section 1170.95 is reversed.  The matter is remanded to the superior court with instructions to issue an OSC and hold an evidentiary hearing.  We offer no opinion regarding the appropriate result of that hearing.


HUFFMAN, Acting P. J.

WE CONCUR:



O'ROURKE, J.



DATO, J.

16